*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
DALY, KISOR, and FLINTOFT
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Jennifer E. ZAVALA**
Lance Corporal (E-3), U.S. Marine Corps
*Appellant*

**No. 202400065**

_____

Decided: 12 May 2026

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Douglas C. Hatch

Sentence adjudged 24 May 2024 by a general court-martial tried at
Marine Corps Base Camp Pendleton, California, consisting of officer
and enlisted members. Sentence in the Entry of Judgment: a
reprimand, reduction to E-1, confinement for 27 months, and a
dishonorable discharge.

For Appellant:
*Lieutenant Commander Meggie C. Kane-Cruz, JAGC, USN*

For Appellee:
*Lieutenant K. Matthew Parker, JAGC, USN (argued)*
*Commander John T. Cole, JAGC, USN (on brief)*

————————————

Senior Judge KISOR delivered the opinion of the Court, in which Chief Judge DALY and Judge FLINTOFT joined.

————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

————————————

KISOR, Senior Judge:

This case involves horrible tragedy. Appellant, aged 19, delivered a baby by herself in her barracks room. The baby did not survive. Appellant was charged with murder, involuntary manslaughter and making certain false official statements about the events surrounding her child's birth. She pleaded not guilty. She was tried by a panel of members and was acquitted of murder and the lesser-included offense of involuntary manslaughter by smothering. Appellant was convicted though of one specification of involuntary manslaughter for failing to get her child medical care after she was born in violation of Article 119, UCMJ.[1] She was also convicted, by exceptions, of two specifications of making a false official statement, in violation of Article 107, Uniform Code of Military Justice (UCMJ).[2]

Appellant raises seven assignments of error (AOEs):

I.   Is the evidence legally and factually sufficient to sustain Appellant's conviction for involuntary manslaughter?

II.  Is the evidence legally and factually sufficient to sustain Appellant's convictions for false official statements?

III. Did the military judge err by not abating the proceedings when the Government lost the decedent's brain before it could be examined to determine the cause and manner of death?

———————————

[1] 10 U.S.C. § 919.

[2] 10 U.S.C. § 907.

IV.   Did the military judge abuse his discretion by not suppressing Appellant's statements obtained during her first Naval Criminal Investigative Service (NCIS) interrogation?

V.   Did the military judge err when he limited the testimony of the Defense's expert psychologist?

VI.   Did the military judge err in his instructions to the members?

VII.   Did the cumulative effect of the military judge's errors deprive Appellant of a fair trial?

We find the convictions for involuntary manslaughter and for making false official statements to be factually insufficient and we set aside the findings and sentence. Our resolution of AOEs I and II moots the remaining AOEs.

## I. BACKGROUND

### A. The Week Before the Incident

On 7 March 2022, Appellant sought medical attention for hip pain. Before undergoing an x-ray, Appellant filled out a pregnancy questionnaire and indicated to Hospital Corpsman Petty Officer First Class (HM1) T.C. that she was not pregnant, and that she had a menstrual period in January.[3] Medical staff took an x-ray of Appellant's hip, which, to their surprise, showed a fetus inside Appellant.[4] The x-ray technician evaluated there was a developed head, spinal cord, and hands present in the x-ray imaging.[5] The x-ray technician informed Appellant that it appeared that the fetus was close to "full-term."[6] For reasons not set forth in the record of trial, Appellant was then given a pregnancy test but not an ultrasound.[7] Naval medical personnel provided Appellant with a pregnancy letter to give to her command that stated Appellant's estimated due date of 18 October 2022, based on Appellant's self-report of her last menstrual cycle being in January.[8] Appellant retained the letter and placed it in her

---

[3] R. at 1077, 1403.

[4] R. at 1133.

[5] R. at 1407; Pros. Ex. 29.

[6] R. at 1115.

[7] We do not understand the purpose of the pregnancy test at that time.

[8] R. at 1490; Pros. Ex. 17.

dresser drawer, later to be found by NCIS investigators.[9] After her appointment, Hospital Corpsman Petty Officer Third Class (HM3) M.G.[10] reached out to Appellant advising her not to take ibuprofen as she was pregnant, and told her that she needed an OB/GYN appointment.[11]

A week after being told by medical personnel that she was six weeks pregnant, on 14 March, Appellant went to sleep, but kept waking up due to "painful cramps" which continued into the morning.[12] An eventual cellphone extraction from Appellant's phone showed internet searches between 0003 and 0538 on 15 March regarding pregnancy. Specifically, there were searches for: "centros de aborto mexicali," "cramp like pain during pregnancy," and "how to deal with 3rd trimester cramping at night."[13] During her interview with NCIS, Appellant recalled she did not "know what was going on or what was wrong with [her] body" at this time.[14]

**B. Appellant Delivered Her Baby in Her Barracks Room**

The next day, Appellant began experiencing significant pain in her abdominal area while she was at work.[15] She believed her pain was due to her irregular menstrual cycle and she went into the bathroom and remained for over an hour.[16] Around 1045, her supervisor, Staff Sergeant (SSgt) B.A., sent her home to rest.[17] When Appellant arrived in her room, her pain became constant. The cell phone extraction revealed Appellant had searched "signs of labor" at 1049.[18] At 1100, she texted the father of the baby "it's an emergency," but he was in the field.[19] At 1207, she texted HM3 M.G. "it's an emergency i need help," but she did not have reliable cell service in her barracks building.[20]

---

[9] R. at 1253.

[10] At the time of trial, HM3 M.G. had promoted to HM2.

[11] R. at 1135.

[12] App. Ex. XXXIX at 16.

[13] Pros. Ex. 23 at 11-16. "centros de aborto mexicali" roughly translates as "abortion clinics in Mexicali." Mexicali is a city in northwestern Mexico, in Baja California.

[14] App. Ex. XXXIX at 17.

[15] App. Ex. XXXIX at 17-18.

[16] R at 1100; App. Ex. XXXIX at 17-18.

[17] R. at 1100, 1321.

[18] Pros. Ex. 23 at 19.

[19] App. Ex. XXXIX at 19; Pros. Ex. 18 at 4. The baby's father was also a Marine.

[20] Pros. Ex. 26 at 3; App. Ex. XXXIX at 19.

She also tried calling SSgt B.A., but her calls were not going through.[21] She was alone in her barracks room when her water broke shortly thereafter.[22] Appellant later told NCIS agents that after her water broke she felt scared, and she began taking off her clothes.[23] Roughly 20 minutes after Appellant had attempted to contact HM3 M.G. for help, she started to deliver the baby.

It was not until 1235 that HM3 M.G. read Appellant's text for help.[24] Hospitalman Third Class M.G. immediately tried to call Appellant several times but her calls did not go through.[25] Hospitalman Third Class M.G. testified she was able to contact SSgt M.C., a member of Appellant's chain of command, to explain that she had received a text from Appellant indicating that she needed help.[26] Hospitalman Third Class M.G. then proceeded with HM1 R.E. to Appellant's barracks room, which was five minutes away from the clinic where they were working.[27] Staff Sergeant M.C. told HM3 M.G. and HM1 R.E. to wait in the lobby of the barracks for a female sergeant that was in Appellant's chain of command before going to Appellant's room.[28]

The cellphone extraction showed that between 1252 and 1309, Appellant searched for: "after giving birth what happens to the placenta," "what happens if the placenta does not come out," and "birth at home video."[29]

At 1313, SSgt M.C. called SSgt B.A. to inform her that Appellant had told one of the corpsman that she was having an emergency.[30] Staff Sergeant B.A. reached out to Appellant via WhatsApp on WiFi since the barracks was known to have poor cell phone reception.[31] Per the barracks duty log book, SSgt B.A. and two corpsmen arrived at the barracks at 1315 to conduct a wellness check

---

[21] App. Ex. XXXIX at 19. *Compare* Def. Ex. V (HM3 M.G's call log) with Pros. Ex. 24 (Appellant's call log) that Appellant's call log showed four outgoing calls to HM3 M.G. whereas HM3 M.G.'s call log did not receive any calls from Appellant on 15 March.

[22] App. Ex. at 17.

[23] App. Ex. XXXIX at 19.

[24] R. at 1136.

[25] R. at 1136-37.

[26] R. at 1137.

[27] R. at 1137.

[28] R. at 1137-38.

[29] Pros. Ex. 23 at 19.

[30] R. at 1101.

[31] R. at 1101, 1141.

on Appellant.[32] At 1323, SSgt B.A. and HM3 M.G. went to Appellant's barracks room while HM1 R.E. remained in front of the building.[33] Staff Sergeant B.A. testified that as they approached the door, she was able to hear a shower running and had received a text from Appellant that she needed a moment because she was going to shower.[34] The two servicemembers waited outside Appellant's barracks room for "twenty-ish minutes" before Appellant answered the door.[35] During this time, HM3 M.G. recalled they "actually started knocking and calling again after a while because . . . she's taking a shower, yes. But at the same time . . . it's kind of an emergency."[36] At 1337, Appellant called SSgt B.A. and said she was "just getting out of the shower" and that she "needed time to get dressed."[37] At this point in time, Appellant had given birth to a baby girl, but was no longer attached to the baby girl via an umbilical cord. And although the umbilical cord was evulsed, Appellant had not delivered the placenta.

## C. Medical Personnel Arrived at Appellant's Barrack's Room

Appellant slightly cracked open the door while crying.[38] Staff Sergeant B.A. further opened the door and saw a baby on the floor.[39] In Appellant's room, SSgt B.A. saw a blanket bunched up on the floor with "a large puddle of blood . . . . at approximately 2 feet by 3 feet. It was still wet. It was a little bit thicker. It appeared that there was some type of matter in it. There were also smaller splots [sic] of blood in the bathroom."[40] The baby was laying on the floor with her upper body clean on the blanket, while the lower half of her body was laying off the blanket which had blood on the legs and groin area, and a severed umbilical cord was connected to the baby girl.[41]

---

[32] Pros. Ex. 5 at 2.

[33] R. at 1104, 1171.

[34] R. at 1105.

[35] R. at 1141.

[36] R. at 1141-42.

[37] R. at 1107; Pros. Ex. 24.

[38] R. at 1108.

[39] R. at 1108, 1142.

[40] R. at 1108, 1212.

[41] R. at 1111-12, 1241. HM3 M.G. testified during cross-examination that there are dangers for the baby if the umbilical cord tears during delivery. She explained, "it's an

Hospitalman Third Class M.G. recalled the baby was "cold, blue-ish gray; really pale . . . limp."[42] After noticing the baby, both SSgt B.A. and HM3 M.G. immediately entered Appellant's barracks room. Hospitalman Third Class M.G. knelt down by the baby in the pool of blood, which soaked her pants. When HM3 M.G. tried to "irritate" the baby by wiping her face and rubbing her back in order to make her cry or clear her airway, she realized the baby was not crying or "responding at all."[43] While HM3 M.G. began performing cardiopulmonary resuscitation (CPR) on the baby, SSgt B.A. called 911 and reported the scene with the Provost Marshal's Office (PMO).[44]

While performing CPR, HM3 M.G. wrapped both hands around the baby's chest, found the middle part of the sternum, and used both thumbs to perform chest compressions.[45] She did not breathe into the baby's mouth.[46] Hospitalman Third Class M.G. directed that she needed her "med bag for suction, just in case the baby had swallowed amniotic fluid."[47] At the time, HM3 M.G. thought she had felt the baby's pulse, but was unsure and wanted a second opinion.[48] Staff Sergeant B.A. left the room to get HM1 R.E. Once SSgt B.A. and HM1 R.E. returned, HM1 R.E. checked for a pulse on the baby's wrist. Although he "couldn't trust himself because of the noise" to find a pulse, he and HM3 M.G. began taking turns performing CPR.[49] Hospitalman First Class R.E. performed mouth-to-mouth CPR by breathing into the baby.[50]

During this time period, SSgt B.A. tried to calm Appellant. Staff Sergeant B.A. testified Appellant explained she did not know when she had given birth because she had "passed out."[51] Appellant further explained she had "fainted

---

automatic, like baby distress, fetal distress. If you don't clamp your umbilical cord before cutting it . . . it rips, because there's two arteries and one vein in that umbilical cord." R. at 1161.

[42] R. at 1143.

[43] R. at 1145.

[44] R. at 1108.

[45] R. at 1143-44.

[46] R. at 1144.

[47] R. at 1109.

[48] R. at 1146-47.

[49] R. at 1173.

[50] R. at 1174.

[51] R. at 1110.

from the pain" and then woke up on the floor when she began to deliver the baby.[52]

At 1348, Mr. J.M., a PMO officer, arrived at Appellant's barracks room within "one or two minutes" of receiving an emergency call for service that was initially for a 20-year-old woman who was not conscious and not breathing.[53] Once he entered Appellant's room, he began to perform CPR, relieving HM1 R.E. and HM3 M.G., and took out his first aid kit.[54] Mr. J.M. testified Appellant was "sobbing hysterically . . . . Her shoulders were rolled forward. Her hands were up. . . . covering her face. . . . Her speech was unintelligible, and she was crying, sobbing."[55] Hospitalman Third Class M.G. asked Mr. J.M. for suction in order to clear the baby's airway since she was not crying. However, HM3 M.G. noted, "nothing would have helped that baby because those first aid kits are directed more for adults, so they're all adult sizes."[56] Appellant told PMO that she did not know whether the "baby was breathing or not."[57]

Shortly after, Mr. P.M., an Emergency Medical Technician (EMT), arrived and attempted to assess the baby's vital signs.[58] He testified the blood surrounding the baby "was a little on the dry side and stickier side than fresh blood."[59] In response to a question about his assessment of the baby, Mr. P.M testified that the "baby had been down for an extended amount of time due to the skin signs color and blood. . . . We call it cyanotic skin cells, which is a blueish purple sign of the skin where it means the oxygen is leaving the body, being depleted, and [the baby loses] skin tone."[60] Mr. P.M further "hooked the baby up" to a machine to track the heart rhythm.[61] The heart rhythm machine

---

[52] R. at 1110.

[53] R. at 1205-6, 1477.

[54] R. at 1147.

[55] R. at 1208.

[56] R. at 1147.

[57] R. at 1113.

[58] R. at 1235.

[59] R. at 1234.

[60] R. at 1235.

[61] R. at 1236.

revealed a "flat line" indicating there was no heartbeat from the baby.[62] The baby was pronounced dead at 1354.[63]

### D. Appellant was Transported to the Hospital

Hospitalman Third Class M.G. accompanied Appellant to the hospital. She remembered Appellant's demeanor as in "emotional shock" and crying.[64] However, Mr. P.M., the transporting EMT, testified Appellant did not appear to be distraught nor was she disoriented.[65] While in the ambulance, HM3 M.G. recalled that Appellant mentioned she did not know she was pregnant and explained she was sent home earlier that day because she was bleeding a lot and cramping from period pains.[66] Mr. P.M. noted Appellant told him that her "last menstrual cycle was August or September [of 2021]."[67] Still in the ambulance, Appellant further explained, "she took a shower because she was bleeding a lot" and once she had gotten out of the shower, she felt a lot of pain, and noticed fluids down her legs.[68] So, she proceeded to pull down her pants, a "baby came out," then she "passed out from the pain," and only awoke when she heard knocking.[69]

Doctor D.L, an obstetrician gynecologist, received Appellant in the labor and delivery department.[70] Doctor D.L. recalled Appellant's demeanor was "very tearful, sad" and she asked a "couple times if [the baby] was a boy or girl."[71] Doctor D.L. noted he had never seen a case where the baby did not arrive with the mother.[72]

---

[62] R. at 1148, 1236.

[63] R. at 1236.

[64] R. at 1148, 1165.

[65] R. at 1238.

[66] R. at 1149-50.

[67] R. at 1239.

[68] R. at 1150.

[69] R. at 1150.

[70] R. at 1544.

[71] R. at 1546.

[72] R. at 1545.

Appellant still had the umbilical cord coming out of her vagina.[73] Doctor D.L. testified that it is not uncommon for umbilical cords to tear during delivery.[74] And when it does so completely, the medical community refers to it as an "evulsion."[75] Lieutenant (LT) L.M., an attending nurse, observed that the umbilical cord was evulsed and looked like it had been "ripped." Although Dr. D.L wrote the "cord was cut at the site of delivery" in his medical notes, he later clarified the more appropriate word should have been "separated"; he wrote "cut" since, in his experience, the cord had only ever been cut.[76] Doctor D.L testified based on his observations, it would not be possible to tell whether the umbilical cord was severed with a sharp object as opposed to being somehow ripped or torn.[77] Additionally, at trial, the Government called Lieutenant Colonel (LTC) W.W., an expert in anatomic, clinical, and forensic pathology, who evaluated the umbilical cord and took photographs of it.[78] Based on this evaluation, she believed "whatever caused that cord to not be intact was not something like razor sharp like a scalpel," but other than that, she could not be more specific.[79]

Doctor D.L. testified that tearing or damage to the umbilical cord is dangerous for the baby and "it wouldn't take very long for a baby to [lose all the blood in their system] from a completely unclamped cord."[80] Additionally, LT L.M. testified that the

> umbilical cord has an attachment from the baby to the placenta, it's important to clamp the umbilical cord for both – more for the baby, but for mom's side, too, to stop bleeding. . . . Babies can bleed out rather quickly if you don't clamp the umbilical cord. . . . If there's still the opening and the cord is pulsating, yes, the baby can bleed out and die from that. It doesn't take very much to bleed out.[81]

---

[73] R. at 1545.

[74] Although not uncommon, Dr. D.L was unable to provide a specific number of instances. However, he has seen the umbilical cord tear many times. R. at 1586.

[75] R. at 1575.

[76] R. at 1552.

[77] R. at 1546.

[78] R at 1727.

[79] R. at 1727.

[80] R. at 1576-77.

[81] R. at 1629-30.

Furthermore, Mr. D.E., the Defense's expert in forensic pathology and pediatric pathology, testified that not clamping the umbilical cord at all can allow the mother to bleed and the baby to lose blood, and can prevent the oxygenation of the baby (how fresh oxygen is delivered in the blood). If an umbilical cord is not clamped at all, a baby could die within minutes.[82]

Medical personnel at the hospital placed a catheter in Appellant and provided Pitocin, which causes uterine contractions, and the placenta was delivered soon after.[83] She was diagnosed with a second-degree tear of her perineum and labial lacerations, and received stitches in both areas.

While Dr. D.L. was treating Appellant, NCIS Agent S.W. attempted to enter Appellant's hospital room to speak with her.[84] Lieutenant L.M. described Agent S.W.'s demeanor as "frustrated" as she demanded entrance into the room, and "yelling over everyone."[85] Doctor D.L. described the NCIS agent's actions as "intrusive."[86] At this time, Appellant was administered fentanyl and her demeanor was "sleepy."[87] Doctor D.L. notified Agent S.W. he had given Appellant narcotics before Agent S.W. entered the room. Nonetheless, Agent S.W. obtained a Permissive Authorization Search and Seizure from Appellant allowing NCIS agents to enter her barracks room.

**E. The NCIS Investigation**

After receiving authorization, around 1710, NCIS Agent E.W. entered Appellant's barracks room as the note taker as part of the Major Case Response Team, a team comprised of special agents who investigate death or complex scenes.[88] During their initial search of the room, NCIS personnel only collected two pieces of evidence: HM3 M.G.'s phone (mistaken for Appellant's) and the pregnancy letter she had been given at medical.[89] At 2110, the agents secured her room pending an interview of Appellant.[90]

---

[82] R. at 1943-44.

[83] R. at 1554.

[84] R. at 1574.

[85] R. at 1627.

[86] R. at 1575.

[87] R. at 1574.

[88] R. at 1247-48.

[89] R. at 1252.

[90] R. at 1254.

Appellant was discharged from the hospital the next day. Three days after the incident (two days after being discharged from the hospital) on 18 March, Mr. G.M., the medical legal death investigator in this case, contacted Appellant to discuss standard operating procedures for conducting autopsies and further studies on the deceased.[91]

Mr. G.M., explained autopsy procedures and extended condolences. Appellant then provided an impromptu statement to Mr. G.M.: "it was unfortunate that I didn't have a roommate, and I was by myself, I could feel it coming and I reached down to grab it and I could hear her crying. Then I blacked out. When I woke up, everyone was in my room."[92] Mr. G.M. explained that since Appellant mentioned "I could hear her crying," he believed that there was evidence of a live birth.

The NCIS agents subsequently brought Appellant in for questioning that same day. Agent S.W. read Appellant's Article 31(b) rights form stating Appellant was suspected of involuntary manslaughter and negligent homicide, but assured her that although those were "very strong words," the only reason NCIS agents had to put them on the form is because her daughter "did not survive the birth."[93] The NCIS agents stated they just wanted to know how Appellant's daughter was born.

Appellant agreed to provide a statement to the NCIS agents about giving birth. She recalled after her failed attempts to get help, her water broke. She went on to explain:

> I got scared so I started taking my clothes off. And then, for a little while, I was like I can't move. And I was just standing up like that. And I was like still getting contractions. And I was still

---

[91] During the course of the autopsy, medical examiners removed the baby's brain and overnight shipped the package to Dover, Delaware via FedEx. Three weeks later, the package containing the baby's brain still had not arrived. The package had been crushed during the shipping process and placed in the bin of damaged packages to be returned to the sender. However, a FedEx employee noticed an unknown liquid leaking from the package and disposed of it. This precluded any opportunity for a forensic pathologist to further examine the baby's brain. R. at 1649-55.

Doctor J.K., an expert in neuropathology, affirmed that even if she was able to examine the brain, that would not have provided any insight as to whether the baby had been smothered. R. at 1735-34. Doctor J.K. further testified that it would not be possible to distinguish between a stillbirth and a live birth by examining the brain. R. at 1732-33.

[92] R. at 1643-44.

[93] App. Ex. XXXIX at 12.

trying to reach out to someone so I could get help. And then, I don't know how much more time goes by. And then, I'm just like if this is happening then, it's – she's going to come out. And so, I don't have anyone there because, unfortunately, I didn't have a roommate . . . . It felt like forever. I want to say it was maybe like 30, 40 minutes. And what I remember when I was – I reached down because it was coming out. She was coming out. So, I reached down to grab her. And then, when she came out and then, from there, I remember I started seeing white spots and I felt really hot. From there, I was gone."[94]

After that, she explained "she went out . . . . I don't know how much time had passed by. And I woke up [on the floor] to my sergeant and my corpsman at my door from when I was trying to call them before."[95] Appellant denied cutting the umbilical cord and maintained she did not know how the umbilical cord was severed. However, she told NCIS agents that the doctors attending to her in the hospital said that the cord "probably tore."[96]

Agent A.V. told Appellant that when "people are afraid, they do things that they do not mean to do."[97] He also said that Appellant must have been afraid in those moments so she "pressed [the baby] hard" against her chest knowing that the baby was going to suffocate.[98] To which Appellant blatantly said "no" to his version of events and requested to start over.[99] The agents continued this manner of questioning, asking her whether she held the baby into her shirt. Appellant replied "not purposely. . . . I didn't purposely do anything to have her not breathe."[100] A few minutes later, Agent A.V. asked: "Did you cover or do anything to your baby for it not to breathe [Appellant]? . . . did you do anything else like maybe hold the baby too tight against you for it not to breathe anymore?"[101] Appellant later adopted the NCIS agent's version of events, stating "maybe when I was on the floor on my knees . . . . if I did – whenever I was

---

[94] App. Ex. XXXIX at 19-20.

[95] App. Ex. XXXIX at 20.

[96] App. Ex. XXXIX at 23.

[97] App. Ex. XXXIX at 85.

[98] App. Ex. XXXIX at 85.

[99] App. Ex. XXXIX at 86.

[100] App. Ex. XXXIX at 104-105.

[101] App. Ex. XXXIX at 109.

on my knees . . . maybe it might have been there when I was holding her. . . . but I didn't purposely."[102]

During the interview, Agent A.V. accused Appellant of intentionally delaying help. In response, Appellant explained, "I'm scared. And I was scared. And I decided to do nothing. And when the help actually got there, I was freaking out because I was like I just sat there and did nothing."[103] Appellant continued that after help arrived, "I answered sergeant and I told her that I was going to take a quick shower. . . . because I was like '[t]his already happened. I didn't help. I didn't do anything.' And I took the time to rinse off and put clothes on." Agent A.V. also asked her why she did not "try to help [the baby]" to which Appellant replied "she was born and she was laying there, I was like I messed up because I'm not helping her. And I gave up . . . . after she was just laying there and I like . . . it's already too late."[104]

While NCIS agents were conducting Appellant's interview, Special Agent M.B., the lead case agent, along with another team of NCIS agents returned to Appellant's barracks room to continue to collect items of evidentiary value. They collected her boots and other clothing.[105] During their search, NCIS agents also focused on finding any object that may have cut an umbilical cord.[106] Agents found a kitchen knife, but no scissors.[107] The agents did not test the knife for the presence of blood or DNA.[108] Additionally, NCIS agents seized and extracted Appellant's cellphone. The extraction revealed internet searches "1 month pregnant stomach" on 13 August 2021; "31 week abortion" and "risks of late abortion" throughout February 2022; "does pregnancy show on x ray," and "abortion clinics near me" before Appellant underwent an x-ray on 7 March 2022; and "can abortion be detected," "32 week pregnancy abortion," "centros de aborto."[109]

On 1 April, Special Agent M.B. interrogated Appellant a second time. Appellant agreed to provide another statement. Her account remained substantially similar. She explained that when she went to the hospital for her x-ray

---

[102] App. Ex. XXXIX at 10-110.

[103] App. Ex. XXXIX at 115.

[104] App. Ex. XXXIX at 116-21.

[105] R. at 1255.

[106] R. at 1288-89.

[107] R. at 1289.

[108] R. at 1815-16.

[109] Pros. Ex. 23 (translated as abortion centers).

she had written down she "wasn't sure" she was pregnant, and at the time of the incident on 13 March, she had "only known she was pregnant for like a week that I had taken a pregnancy test."[110]

When the baby was delivered, she heard "slight crying," but "not very long. And there wasn't a lot of movement."[111] She continued,

> after she came out and I'm on my knees, I put her right where I was standing up. And she didn't really cry. I heard little moans [for around five minutes] I would say she wasn't really moving. . . . my [umbilical] cord was just hanging. And it was just stuff coming out.[112]

Appellant described the "stuff" as "gushing of liquid, yellow liquid and white stuff."[113] She still maintained that she did not know how the umbilical cord separated, but mentioned the doctor told her that it may have torn.[114]

Appellant eventually adopted the previous NCIS agent's presented theory of events, stating she "freaked out" and "covered [the baby's] nose. . . . against my body" while the baby was crying.[115] She stated that she covered the baby's nose for around 5 minutes, but stopped when the baby stopped crying.[116] In response to why she did that, Appellant stated "I was scared because I knew that I wasn't going to have anyone helping me."[117] Ultimately, Appellant agreed to "not wanting [the baby] to live" and intended for the baby to die.[118]

---

[110] Pros Ex. 16; App. Ex. XXXIX at 176.

[111] App. Ex. XXXIX at 170.

[112] App. Ex. XXXIX at 170.

[113] App. Ex. XXXIX at 170.

[114] App. Ex. XXXIX at 170-71.

[115] App. Ex. XXXIX at 180.

[116] App. Ex. XXXIX at 181-83.

[117] App. Ex. XXXIX at 184.

[118] App. Ex. XXXIX at 185.

**F. Appellant was Charged with Violations of Articles 119 and 107, UCMJ**

Appellant was subsequently charged with unpremeditated murder for "smothering Baby Girl Zavala," and, in the alternative, involuntary manslaughter for "failing to provide Baby Girl Zavala medical care."[119] During pretrial motions, trial defense counsel requested a bill of particulars from trial counsel to properly notify Appellant of what acts she was being accused under the charge of involuntary manslaughter. In response, trial counsel provided: "with respect to Charge II, the government's theory is that [Appellant] had an affirmative obligation to obtain medical care for her newborn baby if the baby was born in a state of distress. She was therefore culpably negligent by not immediately seeking medical care."[120]

She was also charged with providing false official statements to Agent A.V.: specifically: "from there I went out;" and "I quickly got up and opened the door," from her first interview.[121] She was additionally charged with providing false official statements to Special Agent M.B., "I wait for people to get there;" "I had only known I was pregnant for like a week;" and "I wrote down that I wasn't sure," during her second interview.[122]

**G. The Trial**

The Government called LTC W.W., who prepared the autopsy report for the baby. She testified she took into consideration "the admission by [Appellant] that she had smothered the baby" when writing the report.[123] But, LTC W.W. medically concluded the cause of death (variable determinative)[124] in this case was "undetermined" because "of a lack of any gross microscopic genetic toxicologic findings that would explain the death."[125] When asked in the context that the baby's umbilical cord was not tied off whether there was enough blood in the baby's system which would indicate something else caused the baby's death, LTC W.W. testified, "I didn't notice less blood. . . . I didn't have difficulty

---

[119] Charge Sheet.

[120] Bill of Particulars, App. Ex. XVI.

[121] Charge Sheet.

[122] Charge Sheet.

[123] R. at 1667.

[124] R. at 1701.

[125] R. at 1711-12.

obtaining blood for those samples, so it didn't appear that there was drastically less blood than usual."[126]

The autopsy report's opinion section stated "homicidal smother could not be excluded."[127] Lieutenant Colonel W.W. explained "homicidal smothering could not be excluded, based on the findings of the autopsy . . . . because smothering deaths very often will have no signs at autopsy."[128] Notably, LTC W.W. testified she specifically did not note "blood loss" as the cause of death because she did not observe a pale color from the blood not being present in the baby's organs.[129] She also concluded the manner of death (limited to: homicide, suicide, natural, accident, or undetermined)[130] was "undetermined."[131] And she explained that she had concluded the manner of death as undetermined in approximately 5 to 10 percent of the over 700 autopsies she had conducted.[132] Ultimately, she concluded there was no medical evidence that would explain why the baby died.[133] Notably, she did not opine, probably because she was not asked, as to whether the baby would have survived if given prompt medical care.

The Government presented evidence at trial that showed the baby's lungs appeared to be fully aerated, which is an indicator the baby was breathing at some point.[134] Lieutenant Colonel W.W. testified the aeration is "supportive of a live birth, and the admission by the defendant that the baby breathed after birth."[135] However, Dr. D.E., the Defense's expert in forensic pathology and pediatric pathology, noted the mouth-to-mouth CPR administered by HM1 R.E. could have explained the aeration of the lungs.[136]

During the Defense's case, Dr. D.E. testified he had reviewed the CT scans and autopsy report. Doctor D.E. concluded that he "can't make the diagnosis of

---

[126] R. at 1723.

[127] App. Ex. CXXV at 9.

[128] R. at 1713.

[129] R. at 1714.

[130] R. at 1701.

[131] R. at 1712.

[132] R. at 1725.

[133] R. at 1715.

[134] R. at 1709.

[135] R. at 1711.

[136] R. at 1952.

live birth in this case."[137] Doctor D.E. also reviewed Appellant's psychological report in her medical file. Doctor D.E. observed Appellant was not a native English speaker.[138] During his review of Appellant's NCIS interrogations, he believed Appellant seemed to have displayed "learned helplessness" by the end of NCIS's interrogation explaining "learned helplessness . . . is the concept that an individual literally learns that there's nothing they can do that's going to change the scenario, they just have to accept whatever it's [sic] going on."[139]

Having heard the testimony and watched the videos of Appellant's interrogations, members acquitted Appellant of murder and its lesser-included offense of involuntary manslaughter by smothering.[140] They found her guilty of involuntary manslaughter for failing to get medical care for the baby after she was born, which only included the window of time during which the baby was alive.[141] Appellant was also found guilty of making three false official statements to NCIS, and acquitted of making two others.[142]

Further facts are incorporated into the discussion below.

## II. DISCUSSION

### A. The Evidence is Not Factually Sufficient to Sustain Appellant's Conviction for Involuntary Manslaughter for Failing to Obtain Medical Care for Baby Girl Zavala.

#### 1. Standard of Review

We follow the CAAF's precedent in *United States v. Harvey* and *United States v. Csiti* in analyzing the three key components of the amended Article 66(d)(1)(B), UCMJ, factual sufficiency review. They are: (1) appellant's specific showing of a deficiency of proof; (2) the Court affording appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence when the Court weighs the evidence and determine controverted questions of fact; and (3) whether this Court is "clearly convinced that the finding of guilty was against the weight of the

---

[137] R. at 1928.

[138] R. at 2019-20.

[139] R. at 2007.

[140] R. at 2446-47; App. Ex. CL.

[141] App. Ex. XVI. She was not charged with any other culpably negligent act, and the members were not instructed on variance.

[142] R at 2447.

evidence."[143] As explained recently by the CAAF in *United States v. Downum*,

> it is no longer appropriate to describe the service courts' standard of review when performing factual sufficiency review simply as "de novo." Instead, when stating the standard of review and performing factual sufficiency review, service courts should cite and follow this Court's guidance in *Harvey*, 85 M.J. at 130-32, instead of the Court's prior guidance in *Washington*, 57 M.J. at 399.[144]

Further, the CAAF explained in *Harvey* that the degree of deference constituting "appropriate deference to the fact that the trial court saw and heard the witnesses" will depend on the nature of the evidence at issue.[145] The CAAF specifically stated that "when the CCA can assess documents, videos, and other objective evidence just as well as the court-martial, the CCA might determine that the appropriate deference is low."[146]

*2. Analysis*

As charged, the elements of involuntary manslaughter in this case are:

(1) that Baby Girl Zavala is dead;

(2) that her death resulted from an act the omission of [appellant] and failing to obtain medical care for the said baby girl Zavala . . . ;

(3) that the killing of baby girl Zavala by [Appellant] was unlawful;

(4) that the act or omission of Appellant constituted culpable negligence; and

(5) that Baby Girl Zavala was a child under the age of 16 years.[147]

The Manual for Courts-Martial defines "culpable negligence" as "a degree of carelessness greater than simple negligence. It is a negligent act or omission

---

[143] *See United States v. Harvey*, 85 M.J. 127 (C.A.A.F. 2024); *See also United States v. Csiti*, 85 M.J. 414 (C.A.A.F. 2025).

[144] *United States v. Downum*, 86 M.J. 200, 206 (C.A.A.F. 2025).

[145] *Harvey*, 85 M.J. at 130 (quoting Article 66(d)(1)(B)(ii)(l)).

[146] *Id.* at 131.

[147] R. at 2294-2295.

accompanied by a culpable disregard for the foreseeable consequences to others . . . ."[148]

The military judge properly instructed the members that "culpable negligence is a negligent act or failure to act accompanied by a gross, reckless, wanton, or deliberate disregard for the foreseeable results to others."[149] Further, the military judge instructed the members that the prosecution had to prove, beyond a reasonable doubt, that there was no independent intervening cause, and that Appellant's failure to act was a proximate cause of the baby's death.[150] A proximate cause must be "a direct or contributing cause which plays a material role" in bringing about the death.[151]

The Government's theory at trial was that Appellant smothered her baby. The Government was unable to prove either murder or the LIO of involuntary manslaughter. The separate involuntary manslaughter charge for failing to get medical care was not the focus of either the Government's evidence, its examination of witnesses, or its closing or rebuttal argument.[152] The only charged negligent omission was Appellant's failure to get medical care for the baby, during the small and indeterminable window of time after she was born but before she died.[153]

### a. Appellant Makes a Specific Showing of a Deficiency in Proof

Appellant argues that the Government did not prove either that Appellant was culpably negligent or that culpable negligence resulted in Baby Girl Zavala's death.[154] Specifically, Appellant argues that the Government presented no evidence that obtaining medical care after the baby was born could have, or would have, prevented the baby's death.[155] The Government, for its part, concedes that Appellant has made the required showing of a deficiency in proof, because "[b]oth the United States and Appellant's forensic pathologist

---

[148] *Manual for Courts-Martial, United States* (2019 ed.) (*MCM* (2019)), pt. IV, para. 57.c.(2) at IV-79.

[149] R. at 2295.

[150] R. at 2293-96.

[151] R. at 2301.

[152] The Government's closing argument spans 28 pages of the record and only 4 sentences were devoted to this charge, which was not mentioned in Government's rebuttal argument at all. R at 2319-47; 2393-97.

[153] Bill of Particulars, App. Ex. XVI.

[154] Appellant's Brief at 28-30

[155] Appellant's Brief at 31, 37.

experts agreed that the medical manner of death was 'best certified as undetermined.'"[156] Accordingly, this Court finds that Appellant has made the requisite showing under Article 66, UCMJ, and *United States v. Harvey* and its progeny to trigger factual sufficiency review.

b. This Court is Clearly Convinced That the Finding of Guilt as to Involuntary Manslaughter is Against the Weight of the Evidence and Must be Set Aside.

This is not a close call. At trial, the Government did not prove, or indeed make much of an attempt to prove, that under the circumstances as they existed, failing to get medical care before the baby died was a proximate cause of Baby Girl Zavala's death.[157] No medical expert could determine the cause of death, and – glaringly absent from the Government's presentation of the evidence – no expert testified that the baby would have survived if medical care had been obtained before the baby's death. Moreover, the window of time after birth where medical care could have saved the baby is temporally opaque because it is unclear how many minutes the baby lived for. (Failing to get prenatal care and/or failing to go to the hospital at any point before the birth were not charged.). In conducting our analysis we weigh the evidence and determine controverted questions of fact. We afford a high degree of appropriate deference to the fact that the members saw and heard the witnesses, including the medical witnesses. We afford a lower level of deference to members' consideration of the videos of the NCIS interrogations of Appellant which occurred on 18 March and 1 April 2022, as we watched these videos ourselves.

After weighing the evidence ourselves, we are clearly convinced that the finding of guilt as to involuntary manslaughter for failing to obtain medical care is against the weight of the evidence and we set it aside.

**B. The Evidence is Factually Insufficient to Sustain Appellant's Convictions for False Official Statements.**

*1. Factual Sufficiency Standard of Review*

The standard of review is laid out in Section II.A.1 *supra.* As we weigh the evidence, we provide appropriate deference to the fact that members saw and

---

[156] Government's Answer at 44.

[157] The Bill of Particulars (App. Ex. XVI) stated that "the government's theory is that Lance Corporal Zavala had an affirmative obligation to obtain medical care for her newborn baby if the baby was born in a state of distress." The Government's brief in this case states, however, "the medical evidence shows Appellant's baby was born healthy . . . ." Government's Answer at 46. We need not resolve this apparent inconsistency.

heard the witnesses. All of the allegedly false statements are contained in the two video statements which we watched ourselves.

*2. Analysis*

a. The Specifications in This Case:

Appellant was charged with making a false official statement to NCIS agents on 15 March 2022 containing two distinct statements: "From there I went out" and "I quickly got up to open the door."[158] Appellant was also charged with making another false statement during a second interrogation on 1 April 2022, containing three statements: "I wait for people to get there," "I had only known I was pregnant for like a week," and "I wrote down that I wasn't sure."[159] Members convicted Appellant by exceptions, acquitting her of the statements "from there I went out" and "I wait for people to get there" and convicting her of the remainder.[160]

b. The Elements of Article 107, UCMJ

In order to prove violations of Article 107 as charged, the Government had to prove that

(1) Appellant made certain official statements to NCIS;

(2) such statements were false;[161]

(3) Appellant knew the statements to be false at the time she made them; and

(4) she made the false statements with the intent to deceive.

The Manual for Courts-Martial explains that to be a criminal offense, a false representation must be made to deceive. Further, "[i]t is not necessary that the false statement be material to the issue inquiry. If, however, the falsity is in respect to a material matter, it may be considered as some evidence

---

[158] Charge III, Specification 1.

[159] Charge III, Specification 2.

[160] R. 2446-47.

[161] The charge sheet, and the members instructions, deviate from the element in the statute by substituting the words "totally false" for "false." R. at 2306. The Manual for Courts-Martial, United States (2019 Edition) explains that to be false, the statement must be "false in certain particulars." *MCM* (2019), pt. IV, para. 41.b.(1)(b) at IV-55.

of the intent to deceive, while immateriality may tend to show the absence of intent."[162]

     c. The Convictions for the Specifications of False Official Statement Are Factually Insufficient

Appellant contends that a specific showing of a deficiency in proof exists as the Government did not introduce any evidence that the first two statements were, in fact false, or that Appellant either knew that any of the statements were false, or that she intended to deceive NCIS agents when she made any them.[163] For its part, the Government rejoins that Appellant's arguments do not amount to a specific showing of a deficiency in proof, citing this Court's opinions in *United States v. Harvey* and *United States v. Valencia*.[164] We hold that under the facts of this case, Appellant has met the threshold showing sufficient to trigger a full factual sufficiency review.

We have watched the videos of Appellant's NCIS interrogations ourselves and thoroughly considered all of the testimony from the witnesses and all other evidence presented at trial. We have weighed all the evidence ourselves and we are clearly convinced that the findings of guilty for making each of the three statements are against the weight of the evidence. As explained below, we do not find that Appellant had any intent to deceive NCIS agents when she made any of the charged false statements for which she was convicted.

     (1) Charge III Specification 1: "I quickly got up and opened the door"

It is undisputed that Appellant answered the door at some point after the corpsman arrived. Appellant contends that whether or not Appellant got up *quickly* is entirely subjective for a woman who has just given birth for the first time, unassisted, and without medication. Appellant points to expert testimony at trial to the effect that an individual's perception of time can be different when they experience trauma, and people can have gaps in memory from trauma.[165] The Government rejoins that Appellant "admitted she did not let [the staff sergeant and the corpsman] in for twenty minutes, and instead she

---

[162] *MCM* (2019), pt. IV, para. 41.c.(1)(d) at IV-55. The military judge did not provide an instruction to the members on the impact of materiality of a statement intent to deceive, and the Defense did not request one. *See* R. at 2305-2307. We need not conduct any analysis of whether this was error, was waived, or was plain error, as our resolution of this Assignment of Error on factual sufficiency renders this issue moot.

[163] Appellant's Brief at 50.

[164] Government's Answer at 54-55.

[165] Appellant's Brief at 48.

showered and changed."[166] The parties therefore agree that the issue is whether or not Appellant's use of the word "quickly" was false and made with the intent to deceive.

We afford a higher level of deference to fact that the members saw heard the various witnesses present, but a lower level of deference to the fact that the members saw and heard the video of the interrogation. It is clear to us that Appellant was having trouble accurately recalling the timeline of events during the birth of her child. At the point that she had opened the door, Appellant had given birth by herself in the barracks, without pain medication, had not delivered the placenta, and the umbilical cord was still hanging out of her. Based on the testimony at trial, at this point the baby was very probably already deceased. Appellant stated several times to NCIS agents during the 15 March 2022 interrogation – truthfully we believe – that she did not remember the timeline of events clearly.

Thus, in weighing the evidence in this case ourselves, we are clearly convinced that the Government did not prove beyond a reasonable doubt Appellant's guilt that her characterization that she quickly got up and opened the door was knowingly and totally false and was made with the intent to deceive the NCIS agents.

(2) Charge III Specification 2: "I had only known I was pregnant for like a week"

As an initial matter, in charging this as a false statement, the Government inexplicably truncated the sentence that Appellant actually stated on the video. The exchange is recounted in full below:

> [NCIS Agent] S.W: Did you ever feel connected to the baby?
>
> [Appellant]: I don't know. I was freaking out. ***I had only known I was pregnant for like a week that I had taken a pregnancy test.***[167]
>
> [NCIS Agent] S.W: I don't think that's true Jennifer.
>
> [NCIS Special Agent] M.B: You and I both know that's not true. So when did you find out that you were pregnant.
>
> [Appellant]: So, I don't have a certain month. I want to say maybe around November. And the first time I had a pregnancy test was a week prior.

---

[166] Government's Answer at 51.

[167] Emphasis added.

[NCIS Special Agent] M.B: So, In October?

[Appellant]: No. When I had taken a pregnancy test.

[NCIS Special Agent] M.B: When did you take the pregnancy test?

[Appellant]: A week after this happened – week before, sorry.

[NCIS Agent] S.W: So there's a difference in taking a pregnancy test and knowing that you are pregnant. So we're not asking when did you take a pregnancy test. We're asking when did you know you were pregnant.

[Appellant]: So, I want to say maybe November.[168]

It is clear to us from watching the video that Appellant's statement, "I had only known I was pregnant for like a week that I had taken a pregnancy test" was oriented toward the pregnancy test result on 7 March 2022, and whether or not she felt emotionally connected with her baby. That statement was not an attempt to deceive NCIS, and the agent's question did not have to do with how long Appellant had known she was pregnant. Moreover, when NCIS agents actually asked her to clarify when she first found out she was pregnant, but not from a pregnancy test, Appellant clarified her answer. We have weighed the evidence, and we are clearly convinced that the finding of guilty for making this false statement is against the weight of the evidence.

(3) Charge III Specification 2: "I wrote down that I wasn't sure"

Here again, the Government charged Appellant with making a false official statement, where the full context of the statement reveals that Appellant was not trying to deceive the NCIS agents. The exchange is recounted below:

[NCIS Agent] S.W: So, I've also had a lot of x-rays. And every time you go in, maybe not for guys, but for women, they always ask, "Are you pregnant of do you think you are pregnant?" Did they ask you that before you went in for your x-ray?

[Appellant]: I filled out a paper and I put – wrote down that I wasn't sure. And the last period date, which was the last time I had been spotting.

[NCIS Agent] S.W: Did you put down you weren't sure or did you leave it blank?

[Appellant]: I think I left it blank.

---

[168] Pros. Ex. 15; App. Ex. XXXIX at 176-77.

[NCIS Agent] S.W: Why did you leave it blank?

[Appellant]: Because I wasn't sure.

[NCIS Agent] S.W: Why not write "it's possible?"

[Appellant]: I was scared because I wasn't sure and I've never been pregnant before. So, that was scary to me, and I wasn't sure.[169]

The Government introduced the "pregnancy questionnaire" from Appellant's x-ray appointment on 7 March 2022. She had indicated on the form that the first day of her last menstrual period was 11 January 2022 and had checked "no," rather than "yes" or "unsure" on the form.[170] The Government contends that Appellant had been trying to hide her pregnancy from her command, and therefore this statement – telling NCIS agents that "she 'wasn't sure' is consistent with her attempts to mislead and minimize her awareness of her pregnancy."[171]

Appellant contends that during her interrogation on 1 April 2022, Appellant simply did not remember what she had checked on the form.[172] Appellant aptly points out in her brief that she was not charged with making a false statement on her medical intake paperwork. Appellant also points out that she equivocated during the interrogation, first saying that she thought she wrote down that she wasn't sure, then thought she may have left it blank. During that interrogation, the NCIS agents did not show her the form, nor ask if she might have checked "no" – they gave her the binary choice to pick whether she put down that she wasn't sure or left it blank.[173] At oral argument, Appellate Defense Counsel correctly, and persuasively, argued that forgetting is not the same as deceiving. Additionally, although we do not decide this issue on this ground, we nonetheless observe that what Appellant recalled, or did not recall, about what she had written on the form is sufficiently immaterial to tend to show an absence of an intent to deceive.[174]

---

[169] App. Ex. XXXIX at 178.

[170] Pros. Ex. 28 at 2. The corpsman noted on the form that "patient stated they were not pregnant. Discontinued x-ray after AP Pelvic x-ray showed fetus." The radiological image itself was introduced as Pros. Ex. 29.

[171] Government's Answer at 57.

[172] Appellant's Brief at 52.

[173] App. Ex. XXXIX at 178. We observe that neither of these options would lead her to an accurate answer if she did not remember.

[174] *MCM* (2019), pt. IV, para. 41.c.(1)(d) at IV-55.

We watched the video ourselves, and we discern no intent to deceive as to this charged false statement. We have weighed all the evidence and we are clearly convinced that the finding of guilt is against the weight of the evidence.

## III. CONCLUSION

After careful consideration of the entire record and briefs of appellate counsel, and the excellent oral arguments of both counsel presented on 15 April 2026, we **SET ASIDE** the findings of guilty and we **SET ASIDE** the sentence. A rehearing is **NOT AUTHORIZED.**

FOR THE COURT:

MARK K. JAMISON
Clerk of Court